SAM HAWKINS v. THE STATE.

No. 3175. Decided June 17, 1914.

1.—Assault with Intent to Murder—Sufficiency of the Evidence.

Where, upon trial of assault with intent to murder, the evidence, although conflicting, was sufficient to sustain the conviction, there was no error.

2.—Same—Charge of Court—Objection.

Where no objections were filed to the charge of the court except in the motion for new trial, they can not be considered on appeal.

3.—Same—Charge of Court—Suspended Sentence.

Where appellant objected to the court's charge on the question of suspended sentence, and the record showed on appeal that the defendant introduced no evidence authorizing the jury to suspend the sentence, the criticism of the court's charge does not present any error; besides, the objection was not made in time.

**4.—Same—Newly Discovered Evidence—Impeachment.**

Where the motion for new trial on the ground of newly discovered evidence was wholly insufficient, and the alleged testimony was on the question of impeachment, and, besides, there was a want of diligence in procuring same, there was no error in overruling the motion. Following Gray v. State, 65 Texas Crim. Rep., 204.

Appeal from the District Court of Waller. Tried below before the Hon. Samuel J. Styles.

Appeal from a conviction of assault with intent to murder; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

No brief on file for appellant.

*C. E. Lane,* Assistant Attorney General, for the State.

PRENDERGAST, PRESIDING JUDGE.—Appellant was convicted for an assault with intent to murder William Sims, and his punishment assessed at three years confinement in the penitentiary.

On the night of August 9, 1913, the negroes had a supper at Bob Riley's. A fight there occurred between appellant and Jim Roberts in which Jim Roberts cut and broke appellant's nose and also cut him on the arm. William Sims was not at the supper, but passing there, Roberts, in leaving, had Sims to get in his buggy and go with him. Sims and Roberts were brothers-in-law. Sims went on to his home where he resided with his wife and daughter. The record does not disclose what became of Roberts. Appellant and his brother, Will Hawkins, and Napoleon Arrington thought Sims was concealing, or protecting, Roberts in his house. George Lewis and his wife, who lived across the street from Sims and in about eighty feet, both, in effect, swore that they heard loud talking over at Sims' and got out in their yard; that they saw said Will Hawkins, appellant and Arrington near Sims' house; that they saw these three parties go up to and away from Sims' house about three different times and then return; that Sims struck a light in his house when one of the three persons shot into Sims' house and they went over to Sims' and found that he had been shot; that both Will and Sam Hawkins had guns. George Lewis swore that it was Will Hawkins who fired into Sims' house; that Sam was some ten or fifteen steps away and fired his gun up in the air.

Nannie Sims, William's wife, swore that Will and Sam Hawkins and said Arrington came to their house and called for Jim Roberts; that her husband told them Roberts was not there; then they said they wanted William Sims; that they cursed and abused William, herself and Roberts; that they threatened to blow her head off; Will Hawkins had a Winchester and Sam had a gun; she didn't see Arrington have a gun; that she, her husband and daughter were all in one room when these parties were cursing and calling for Roberts; that her husband told them he would light a lamp and let them come into the house and see

for themselves; that when he struck a match she and her daughter went out of the room; that Will Hawkins fired into the house, the ball coming in through the wall near the window and struck her husband in the thigh. Her daughter, Pearl, swore that she, her father and mother were in one room when these parties came to the house; that when her father struck a match she and her mother ran out of the room; that Will Hawkins was threatening to shoot into the house was the reason they ran out; that she saw the three parties walking off thirty or forty feet from the house after the shooting. William Sims swore that said three parties came to his house looking for Roberts, and demanded that he should put him out; that he protested that Roberts was not in the house and offered to strike a light, let them come in and themselves search for him; that Will and Sam Hawkins were two of the parties at his house at the time of the shooting; that when he struck the light Will Hawkins fired into his house, the ball coming through the wall, striking him in the thigh and passing entirely through it; that Will and Sam Hawkins were the parties at his house at the time this shooting occurred; that he and the Hawkins had been good friends before that. The constable swore that he went to Sims' house the next morning after the shooting and saw a bullet hole in the wall near the window in the room where Sims was shot the night before and he saw another small bullet hole in the top of the front door, higher than a man's head. Dr. Searcy swore that William Sims was shot the night before, the ball passing through the fleshy part of his thigh; that it was a dangerous wound, that he saw the bullet hole through the wall, near the window; that he waited on William Sims for his wound. Sims is shown to have been laid up several weeks from his wound.

Appellant testified denying that he was present at the time Sims was shot. He swore, himself, and had witnesses to testify that when he was wounded at Riley's supper one of his friends took him to his house nearby and that he remained there too badly wounded to go to Sims' house and did not go and was not present when Will Hawkins shot Sims. In other words, his defense was alibi. The evidence, by him and his witnesses, if believed, would have been sufficient for the jury to have acquitted him on that account. On the other hand, several witnesses swore positively and identified him as being present,—one of the parties with Will Hawkins when they were demanding Roberts and was a principal in the shooting of Sims. All this was for the jury. The court in a clear charge, which is not complained of, submitted appellant's defense of alibi; also in submitting the case required the jury to believe, beyond a reasonable doubt, every essential fact to show, that appellant was a principal in the shooting of Sims, before they could convict him.

No objection in writing whatever is shown by appellant to have been made to the court's charge before it was read to the jury. Appellant has some objections to the court's charge first made in his motion for new trial. These objections can not be considered under the Act of April 5, 1913, amending article 737 and others of the C. C. P.

No plea for suspended sentence appears in the record, but the court

stated in his charge that there was such plea and submitted that question to the jury for a finding. The jury, by the verdict, did not suspend his sentence. Appellant has a bill of exceptions to a portion of the court's charge on that subject. The State urges that that bill can not be considered because no objection in writing was made to the court's charge prior to the time the court read his charge to the jury. The bill, which was approved and filed long after the court adjourned for the term, merely states "that on the trial of the above cause" he objected to the latter portion of the court's charge on suspended sentence, claiming that it was on the weight of the testimony. We think the State's objection to the consideration of this charge is well taken, but even if we could consider it and it had been made in time, it shows no reversible error, because appellant introduced no evidence whatever to authorize the jury to suspend the sentence. He himself did not swear that he had never been before convicted of a felony and no other witness so swore. In fact, as stated, he offered no proof whatever to authorize the suspension of his sentence. So that, even if the judge's charge on this subject was subject to criticism as being on the weight of the evidence, no injury is shown to appellant.

One ground of appellant's motion for new trial is his claim of newly discovered testimony. His motion on this ground is wholly insufficient. Gray v. State, 65 Texas Crim. Rep., 204, 144 S. W. Rep., 283, and authorities there cited. Besides, the claimed newly discovered evidence could have been used solely for the impeachment of one of the State's witnesses and by all the authorities this presents no ground for a new trial, and even would have been no ground for a continuance where diligence and the absence of the witness is shown.

Nothing else is presented which requires any discussion. No reversible error is shown and the judgment is affirmed.

*Affirmed.*