## ALTMAN v. STATE.
### No. 14758.

Court of Criminal Appeals of Texas.

June 1, 1932.

State's Rehearing Denied June 22, 1932.

Stinson, Hair, Brooks & Duke, of Abilene, for appellant.

H. F. Grindstaff, Dist. Atty., of Aspermont, and Lloyd W. Davidson, State's Atty., of Austin, for the State.

CHRISTIAN, J.

The offense is murder; the punishment, confinement in the penitentiary for ten years.

It was charged in the indictment, in substance, that appellant, with' malice aforethought, killed Sam Tanner by shooting him with a gun.

Deceased owned and lived on a farm. Appellant moved with his wife to deceased's farm in 1929. He cultivated some of the land and at times did work for deceased, such as carpentering, hauling, and building cisterns. P. R. Allen and his wife, Velma Allen, lived in deceased's home; deceased having reserved one or two rooms for his own use. Appellant had bought some mules, deceased going on his note, which was secured by a chattel mortgage. on the mules and other personal property.

Appellant testified, in substance, as follows: In the fall of 1930 his mother gave him two letters, one from his wife to deceased and the other an unsigned letter from deceased to his (appellant's) wife. After seeing these letters, he made an investigation and found out from his wife that deceased had been trying to get her to quit him, and come to him (deceased). He then made preparations. to leave deceased's place and go to New Mexico. Before leaving, he and deceased agreed upon a settlement of their business affairs. Deceased agreed to pay his (appellant's) debts and pay' him about $150 in addition. He agreed to cancel all of his accounts against deceased for work. he had done for him, and, further, agreed to turn his crops and mules over to deceased. Taking his wife with him, he went to the home of his relatives in New Mexico; his purpose being to get his wife away from deceased and avoid trouble with him. He returned two or three times before the killing in an effort to settle his business affairs and to try to get deceased to keep his agreement to pay his (appellant's) debts. On his last

trip to Stonewall county in February, 1931, while he was out hunting with a rifle, he went to deceased's house at 2:30 p. m. and got a drink of water and something to eat. Mrs. Velma Allen was present in the house. Deceased was not there at the time. Going in the direction of the hogpen some distance removed from the house, he found deceased near the fence and not far from a barrel. Stopping, he asked deceased to pay him what he owed him, as he needed it badly. Deceased got mad, saying to him: "I am never going to pay you that money, you s—— of a b——." Further, deceased said: "I don't want to have nothing to do with you. I told your wife I would get you out of the way and G—— d—— you, I am going to do it." As he used these words, deceased got behind the barrel and reached for his hip, as if to draw a weapon. Thinking deceased was going to shoot him, he fired one shot. He did not want to kill deceased, but fired to protect himself. He did not know after he had fired whether or not he had killed deceased. He felt at the time he fired the shot that deceased was endeavoring to break up his home, and he was trying to protect his life and his family.

Appellant's wife testified that deceased had made improper advances toward her, and had threatened to do away with her husband. She said she had told her husband about the matter before the killing.

P. R. Allen, a witness for the state, testified that he saw appellant the day before the killing and had a conversation with him; that appellant asked him if he had seen deceased, saying that he wanted to see him; that appellant stated further that he was going to kill deceased the first time he got him off of the place; that he asked appellant what he wanted to kill deceased for, and appellant replied because he would not pay him what he owed him. The wife of this witness testified for the state that shortly before the killing appellant came to her house and got a drink of water and something to eat; that after eating appellant left the house, going south down the road; that she stepped out on the porch and watched appellant; that he was walking pretty fast; that he had a rifle in his hand; that he turned east after going over the hill and went in the direction of a hog lot; that, after reaching the hog lot, appellant pointed the gun at a man who appeared to be in the hog lot; that she heard loud talking; that, as she turned away to open the door to go back in the house, she heard a gun fire; that turning back toward the hog lot she saw only one man standing there; that she saw that man leave and walk east with the gun still in his hand. At this point we quote the testimony of the witness as follows: "The man that I saw in the hog lot was in plain view, and I saw him plainly. I didn't see him make any movements of any kind. If he ever moved I did not know it.

I was not facing in the direction at the time the gun fired."

The witness testified, further, that the man appellant was pointing the gun at was dressed in light clothes and had a black hat on. She said he looked like he was on the inside of the hog lot. She said further that it was just a few minutes after she heard loud talking that there was the report of the gun. She testified she did not see anybody fall. Deceased's son testified that he was about 175 yards from the hogpen on the occasion of the homicide; that he heard a voice in the direction of the hogpen say "you s—— of a b——," and he turned around; that when he turned around he heard the report of a gun; that when he came in view he looked and saw a man standing outside the fence, with a smoking gun in his hand; that this man said again after he had fired "you s—— of a b——"; that he did not see anybody inside of the hog lot.

*Deceased was found dead near the hog lot.*

Prior to the return of the indictment, state's witness P. R. Allen, who was a tenant of deceased and in whose home deceased was living at the time of the homicide, had gone before the grand jury and testified that he heard appellant threaten to kill deceased the day before the homicide. In connection with this statement, the witness testified before the grand jury as follows: "He didn't give much of any reason right then why he was going to kill him. He never did give me any reason before, only some time back. Then he said he was mad at Sam Tanner (deceased)—said Mr. Tanner had been fooling with his wife. That was before he left the first time. He never did say anything about he and Tanner having some business relations that were not pleasant."

Mrs. Velma Allen, the wife of P. R. Allen, also went before the grand jury before the indictment was returned and testified. After stating to the grand jury that appellant came to her house shortly before the killing and got a drink of water, and that she saw him leave, the witness testified before the grand jury as follows: "I did not observe Homer (appellant) after he left the house; I did not see him any more after he went over the gravelly hill. After he went over the first hill I did not see him any more. It was just a short while after that before I heard the loud talking coming from the direction of the hog pasture; I would say some 10 or 15 minutes, something like that. I could not tell any particular words that I heard spoken over there, but they were talking awfully loud. One voice was all that I could hear. I would not be positive whether that was Sam Tanner's voice or Homer Altman's. I heard a shot, and saw one person down there after the shooting. I was in the house at the time of the shooting, but I walked out on the porch when I heard the shot, and saw one person. That person

was going east from the hog pasture. He was not going across the hog pasture; he was going from the hog pasture. That must have been two or three minutes after the shooting. I did not tell anybody what I had seen down there. * * * When he left the house I did not watch him until he went out of sight, but I went back a few minutes later to see where he had gone; I thought it was kind of strange having a neighbor boy to come and ask for something to eat, so I went back to see and he was going down the road toward his home. He was walking pretty fast. I just went to see where he was and he was walking pretty fast. When I heard this loud talking down there I could not understand anything that was said."

It appears that the testimony of these witnesses was reduced to writing in the grand jury room and was in the possession of the state at the time of the trial.

■ In his motion for a new trial appellant set up newly discovered evidence, and alleged that he did not know at the time of his trial that the witnesses P. R. Allen and Mrs. Velma Allen had given the testimony to which reference has been made while before the grand jury; that he and his attorneys did not learn about the matter until after his conviction, and that then they were told of the fact by a party who knew that they had so testified before the grand jury; that, not knowing that the testimony given by the witnesses upon the trial was contradictory of their testimony given before the grand jury, appellant's counsel did not cross-examine the witnesses concerning the matter and lay a predicate for the impeachment of such witnesses; that appellant's counsel did not feel that they had the right before the trial to interrogate grand jurors as to testimony given by witnesses before the grand jury in the investigation of the homicide; that P. R. Allen and his wife entered into a conspiracy to give perjured testimony against him in order to secure his conviction; and that the newly discovered testimony would strongly tend to sustain such theory. The motion for a new trial was supported by the affidavit of appellant. Attached to the motion were the affidavits of appellant's attorneys, in which it was alleged, in substance, that they used diligence to prepare the case for trial, and that they did not know until after the conviction of appellant that the witnesses had given testimony on the trial contradictory of their testimony given to the grand jury. It was averred in the affidavits that counsel did not believe they had the right before the trial to question the grand jurors concerning the testimony of witnesses given during the investigation of the homicide. The testimony heard by the court on the presentation of the motion supported the averments of the motion.

The opinion is expressed that a new trial should have been granted. As heretofore

stated, appellant testified that, when he asked deceased to pay him what he owed him, deceased jumped behind a water barrel, cursed him, and made a movement as if to draw a pistol, and that he shot deceased, believing that his life was in danger. The state's theory was that appellant shot deceased in an endeavor to make him pay him some money. The testimony of the witness P. R. Allen, given on the trial of the case, supported this theory; he having stated to the jury that appellant told him, in effect, the day before the homicide that he was going to kill deceased because he would not pay him what he owed him. Supporting the state's theory was also the testimony of Mrs. Allen to the effect that she saw appellant holding the gun on deceased and heard some loud talking, and that, as she turned away toward the door to enter the house, she heard a shot. Further, she said, in effect, that the man in the hog lot made no demonstration toward appellant. Thus the testimony of these witnesses tended to show a cold-blooded and deliberate murder. The son of deceased did not see the fatal shot fired, but only testified that he heard cursing and after the firing of the shot saw some one leave the hogpen, carrying a gun. P. R. Allen and wife were two of the most important state's witnesses. They gave testimony tending to destroy appellant's theory that he had no intention to kill deceased, and acted in self-defense at the time he fired the fatal shot. These witnesses had been before the grand jury shortly after the homicide when the facts and circumstances concerning the transaction were fresh in their minds. That the testimony they gave many months after the return of the indictment was directly contradictory of the statements made before the grand jury, if known to the jury, might have led to the conclusion that said witnesses entered into a conspiracy to give false testimony on the trial of the case for the purpose of convicting appellant.

While in a certain sense impeaching, the newly discovered evidence is more than that. It tends to show a conspiracy on the part of P. R. Allen and wife to bring about a conviction of appellant on manufactured testimony. This is said with no intention to reflect upon any officer connected with the prosecution of the case. If the statement the witnesses made before the grand jury was true, then their testimony given upon the trial of the case could not have been true. In Piper v. State, 57 Tex. Cr. R. 605, 124 S. W. 661, 662, this court held in a trial for aggravated assault that, where the evidence was conflicting on the issue whether the accused attempted to attack prosecutrix, newly discovered evidence disclosing the fact that a third person had told prosecutrix that she must swear the accused attempted to attack her was held to require a granting of a new trial. In disposing of the question in Piper's Case, this court, speaking

through Judge Davidson, said: "This testimony, in a certain sense, is impeaching; but it is more than that. It shows a conspiracy on the part of McClure and this woman to bring about an illegal conviction on manufactured or perjured testimony, if Ferguson's statement is correct." See, also, Cottrell v. State, 91 Tex. Cr. R. 131, 237 S. W. 928; Chenault v. State, 83 Tex. Cr. R. 104, 201 S. W. 657.

In reaching the conclusion that a new trial should have been granted, we have not lost sight of the fact that it is the general rule that newly discovered testimony which would not be admissible as original evidence, but which could only be used to discredit or impeach the testimony of a witness who had testified on the trial of the case, is not ordinarily ground for a new trial. See Branch's Annotated Penal Code, § 202; Hawkins v. State, 74 Tex. Cr. R. 452, 168 S. W. 93.

Further, in his motion for a new trial, appellant alleged that he and his counsel had learned since his conviction, for the first time, that in the fall of 1930 deceased told one Gid Sinn, in substance, that he had a mighty pretty little woman on the string, but that he might have to bump her husband off to get her; that this woman lived on his place with her husband, and that, if he could get some one to buy their stock, he thought that he could get rid of the husband; that the stock was mortgaged to secure him, and if the witness would buy the stock he would furnish the money to buy it. It was averred in the application that this testimony did not come to the knowledge of appellant until the argument was being made in the case; that a witness then told appellant's counsel that he heard the witness Sinn say that this statement had been made. It appears that neither appellant nor his counsel knew of this matter nor could have learned about it sooner by the exercise of diligence. The affidavit of Gid Sinn was attached to the motion for a new trial. The averments in the affidavit supported the allegations in the motion. The affidavit was introduced in evidence on the hearing of the motion. In view of the fact that the case must be reversed because of the matter hereinbefore discussed, we pretermit a discussion of this ground of the motion for a new trial.

The judgment is reversed, and the cause remanded.

PER CURIAM.

The foregoing opinion of the Commission of Appeals has been examined by the judges of the Court of Criminal Appeals and approved by the court.

On State's Motion for Rehearing.

HAWKINS, J.

Motion for rehearing in behalf of the state has been filed by Hon. H. F. Grindstaff, the district attorney who prosecuted this case. We commend his interest in presenting to this court the views upon which he thinks the judgment should be affirmed. After the most conscientious consideration of the motion of which we are capable, and review of the points upon which reversal was predicated, we feel that the original opinion made proper disposition of the case and is supported by the authorities referred to in the opinion.

The motion for rehearing is therefore overruled.